UNITED STATES FIDELITY & GUARANTY CO. *v.* STATE TO USE PINKERTON.

[83 South. 2, In Banc. No. 20665.]

OFFICIAL BONDS GUARANTY OF OFFICIAL ACTS ONLY.
Where a bonding company only insured the proper performance of the official acts of a state live stock inspector for a county, it was not liable for what he did unofficially in dipping cattle, under the direction of a federal official, to allow of their transfer into another county.

-Oct. 1919] Fidelity & Guar. Co. *v.* State, ex rel. 667

120 Miss.]                Brief for appellant.

Appeal from the circuit court of Wayne county.

Hon. T. W. Heidelberg, Judge.

Suit by the state of Mississippi for the use of J. T. Pinkerton, against the United States Fidelity & Guaranty Company. From a judgment for the use of plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Watkins & Watkins, E. W. Breland* and *Wm. Hall,* for appellant.

(a) It will not be contended that any agent, servant or officer of the United States Fidelity & Guaranty Company in any manner committed a wrong to the injury of the appellee, or directly or indirectly participated therein. Liability is predicated against the appellant solely upon the ground that it became and was the surety upon the official bond of E. W. James from February, 1917, to February, 1918, as Live Stock Inspector of Greene County, Mississippi. It is therefore elementary that before the appellant can be held liable, James, the appellant's principal, must in his official capacity, have been guilty of some violation of duty which he owned to the appellee. Even if it should be conceded, and we by no means make such concession, that James was guilty of wrong or misconduct, the appellant would in no manner be liable therefor unless such wrong or misconduct arose during the performance of some official duty. In other words, the appellant never insured the conduct of E. W. James individually; it merely undertook to guarantee that in the performance of his official duties in respect to people to whom he owed duty by reason of his office, that he would be faithful.

The case of *Robinson* v. *State of Mississippi,* 47 Miss. 423, is illustrative, in that case the appellant became surety on the bond of the sheriff in Madison County,

Mississippi; the sheriff was appointed administrator of some estate, in which capacity, he defaulted. One of the official duties of the sheriff was to act as administrator in certain cases. The surety on his sheriff's bond was sought to be held liable for his defalcation as administrator, and this court held that there was no liability.

In the case of *State* v. *Felton,* 59 Miss. 402, it was held that the sureties on a state treasurer's bond were not liable for his default in respect to the school fund entrusted to him, which was protected by a different bond. *State* v. *Harney,* 57 Miss. 863. The entire question was reviewed in the case of *Furlong* v. *State,* 58 Miss. 717; *Brown* v. *Phipps,* 6 Smed. & M. 51. To the same effect is *The Commonwealth* v. *Swope,* 45 Pa. St. 535.

In the case of *Lewis* v. *State,* 65 Miss. 468, 4 So. 429, it was the duty of the circuit clerk to issue witness certificates under certain circumstances. He had the real authority to issue these certificates in proper cases; he there had apparent authority to issue any witness certificate and the forged certificates in that case therefore issued under his apparent authority or *colore oficii.* In the case of *Adams Rev. Agent,* v. *Saunders,* 89 Miss. 799, 42 So. 602, 119 Am. St. Rep. 720, 11 Am. Cas. 237, Saunders was the tax collector of Oktibbeha county and had the apparent authority to collect the taxes therein collected by him. These taxes were therefore collected by him *colore oficii.* In the case of *State* v. *McDaniel,* 78 Miss. 1, 27 So. 994, 50 L. R. A. 118, 48 Am. St. Rep. 618, the Mayor was acting within the apparent scope of the authority of his office in the line of his official duty. His action was merely in excess of his jurisdiction, and, for that reason, what he did was done *colore oficii.* The same rule was re-announced and affirmed in the case of *Lizanna* v. *State,* 109 Miss. 464, 69 So. 292. See, also, *Lewis* v. *Johnson,* Walk, 260; *Furlong* v. *State,* 58 Miss.

717; *Brown* v. *Phipps,* 6 Smedes & M. 51; *Brown* v. *Moseley,* 11 Smedes & M. 354.

It was held in the case of *Brooks Oil Co.* v. *Weatherford,* 91 Miss. 591, 44 So. 928, that where a judgment debtor pays money to the sheriff in order to satisfy a judgment, but before any execution has been placed in the hands of the sheriff, this constitutes no payment of the judgment. The court, in part, said: "When the payment was made to the sheriff, he was simply the agent of Weatherford, and if he did not pay it over, Weatherford must look to him for it."

In the case of *Alcorn* v. *State,* 57 Miss. 273, it was held that the sureties on the bond of a chancery clerk are not liable for money received by him as a commissioner, though this appointment as such commissioner was by virtue of his office as chancery clerk. See, also, *Denio* v. *State,* 60 Miss 949.

In 29 Cyc., page 1455, the law is announced on the subject as follows: "An official bond is not regarded as imposing liability for the purely personal acts of officers not done as a part of or in connection with their official duty, as, for example, the receipt of money which it was not the officer's duty to receive, or the arrest of an individual, or the seizure of property without a warrant. But in most states acts done by color of office are regarded as acts for which sureties on official bonds are liable; thus where an officer having an execution seizes the goods of one person when the execution is directed to another, or having a warrant, arrest the wrong person, the sureties on his bond are liable." A further citation of authorities would be useless consumption of the court's time.

*Heidelberg & Johnston,* for appellee.

Attorney for appellant argues in his brief that James, the inspector, had nothing to do with the dipping of the

cattle of the plaintiff, and that for this reason the surety on his bond, the United States Fidelity and Guaranty Company, is not liable for any damages that may have been caused by the dipping of plaintiff's cattle. He insists that the cattle were dipped by Thompkins, the government inspector, and that it was not the duty of James to dip them, or superintend their dipping, but was the duty of Thompkins, and that hence the surety on James; bond is not liable. The evidence shows that James was the man who prepared the fluid in which the cattle were dipped, that he was the inspector at this particular vat, having been appointed in March, 1917, and continued until the first of the following year, and that in July of this year when the cattle were dipped, he was inspector of this particular vat, and that it was his duty to prepare the solution in which they were dipped and did in fact prepare it. He insists that he is not liable because the government inspector was present at the time, as was also James. This government inspector was there for the purpose and only purpose of seeing that the cattle were free from ticks, and that they were properly dipped and to issue a certificate permitting them to be removed to the adjoining county of Wayne. James claims that he turned the dipping of the cattle over to the government inspector, though this must have been only a mental turning over, as Tompkins admits that all he did or was there to do, was to see that the cattle were free of ticks, and were properly dipped and to issue a certificate for their removal to Wayne County. Counsel has evidently overlooked the statute which makes it the express duty of the inspector to prepare, or supervise the preparation of the vats and the fluids to be used therein for the purpose of tick eradication and to supervise the dipping of the cattle.

The last sentence of section 3, chapter 167, Laws of 1916 (page 231) is as follows: "The county inspector or assistant inspector shall supervise the preparation of

the vats and the fluids to be used therein for the purpose of tick eradication and shall conduct and supervise the dipping of cattle in such manner as to insure the eradiction of cattle tick during the present year, but if for any reason the cattle tick in such counties should not be eradicated and destroyed and such territory declared to be immune during the present year, then the work shall be continued until the cattle tick be permanently eradicated and destroyed.''

The following section of the same act makes it an indictable crime, punishable by fine or imprisonment to fail to perform this or any other duty mentioned in the act by the inspector. Simply because it is made the duty of some federal officer, if any such duty exists, to also be present and see that the cattle were free from ticks and that they were properly dipped, before issuing a permit for either interstate or intrastate shipment, did not relieve the inspector from the plain duty of the statute. James was a county inspector of Greene County. He had charge of the particular vat in which Pinkerton's cattle were dipped at the very time of the dipping, because he said that he had it in charge from March until the following January. He prepared the deadly solution which proved so fatal to the cattle of the plaintiff. He it was that mixed it. It was he who put the arsenic in, that must have been the direct cause of the death of plaintiff's cattle. It was made his duty by express provision of the statute to see that the fluid was properly prepared. He was required to execute a bond for the performance of his duties as an inspector. Chapter 221, Laws of 1914 (page 287) provides: ''That inspectors, and other officers appointed by the state live stock sanitary board shall each be required to enter into bond payable to the state of Mississippi in the sum of two thousand dollas conditioned for the faithful performance of their duties.''

"Section 2. Every inspector or other officers of the state live stock sanitary board, shall be civilly liable on his official bond for any damage to cattle or other live stock resulting from his negligence or incompetency."

Can it be seriously contended that a state officer can be released from his duty, or that his surety can escape liability, for his neglect of duty because a federal officer was there to perform certain duty required of him by some federal law, or regulation, relative to the movement of cattle from one county to another or from one state to another? And that, too, when this last-named officer is under no bond for the discharge of his duties? In enumerating his duties Thompkins does not even say that it was his duty to see that the solution was properly prepared, but on the contrary, says that James prepared it and that he was not present when it was prepared, and that it is the duty of the inspector in charge of the vat to prepare the solution. He also says that there is no rule as to where cattle from one county to another shall be dipped. When asked what were the duties of James an inspector, he said: "His duties are to keep the vats up to their proper standard and to see that all of the cattle were dipped; to dip cattle when presented at the vat, and when anybody did not bring his cattle to be dipped to see that they brought them and dipped them, and if any body did not come in, it was his duty to go and see why they did not come and dip them: etc. If it was not the duty of Thompkins to prepare the solution nor to test it, but merely to see that the cattle were dipped, and were free from ticks and to issue the permit, was he liable for the death of plaintiff's cattle caused by the mixture being too strong of arsenic or for it not having been sufficiently mixed; if the suit had been brought against Tompkins, instead of against the surety on the bond of James, all of the authorities cited by counsel for appellant would be to the point, and could be interposed as a bar to such suit, but certainly they

have no sort of application to a suit against the surety
on the bond of James. But admit, for argument's sake
that Thompkins is liable, would this fact release the
surety of James from liability; was not the improper pre-
paration of the fluid in the vat, the direct and immediate
cause of the damage to the cattle?

For the reasons heretofore assigned we submit that
there is no merit in any of the objections to the instruc-
tions given, nor any foundation for the contention that
those not given should have been given.

COOK, J., delivered the opinion of the court.

One E. W. James was duly appointed live stock in-
spector for Greene county, Mississippi, from the 15th
day of February, 1917, to the 15th day of February,
1918, and the appellant became surety on his bond, as
provided for under the statutes, for two thousand dollars.
On or about the fifth day of July, 1917, the appellee sent
a man by the name of Landrum into Greene county,
Mississippi, to buy some cattle for him. Landrum
bought the cattle in several different bunches, buying a
total of nineteen head in Green county. These cattle
were dipped at some dipping vat in the neighborhood in
which they were situated, on or about the fifth day of
July, 1917. Before the cattle could be transferred to
Wayne county, where the appellee lived, it was neces-
sary to get what is known as a transfer certificate.
These transfer certificates were issued by a federal
official by the name of Dr. Thompkins, and before the
federal officer would issue the transfer he required that
the cattle be dipped again; so Landrum, the appellee's
agent, for that purpose drove the cattle from the neigh-
borhood of their purchase to what is known as Smith's
dipping vat, in beat 3 of Greene county, Mississippi.
In order to get them to this vat it was necessary to
drive most of them a distance of several miles, and

120 Miss.—43

they reached the neighborhood of Smith's vat late in the afternoon of the 5th of July, 1917. The next morning about 8 o'clock, Dr. Thompkins, the federal official who was to issue the permission for transfer, appeared on the scene and superintended their dipping.

E. W. James, the appellant's principal, was present, but had nothing to do with their dipping. His duty was confined to dipping Greene county cattle in the neighborhood of the different vats in the county, and there are shown to have been thirteen; but, while he was present at the dipping vat, he had nothing to do with the dipping of the cattle in question, and owed no duty to the appellee in respect thereto. A large number of the cattle dipped died soon after they were dipped, and all of them were injured. It will be noted that E. W. James was a local inspector for Greene county, and that the cattle, under the law and the rules of the state live stock sanitary board, had to be dipped before they could be transferred to Wayne county.

We here copy the rules of the live stock sanitary board touching the transfer of the cattle in question, viz.:

"Regulation 4. No cattle shall be permitted to move from the quarantined area of Mississippi as set forth in regulation 2 of these regulations, or from the quarantined area of any other state, into any county in this state either quarantined or released from quarantine, or from any quarantined county in this state into another quarantined county in this state, except as hereinafter provided:

"Cattle known to have been subjected to the course of regular dipping every fourteen days in standard arsenical solution, as provided by the regulations of this board, and upon close inspection have been found free of ticks, may after one additional dipping just prior to the contemplated movement, and without further exposure to infestation, be issued a permit by a state live stock inspector, or by a United States Bureau of

Animal Industry inspector, for movement within the state, or by Bureau of Animal Industry Inspector for interstate movement for any purpose, and when so shipped shall be handled in cleaned and disinfected cars. A duplicate of every permit so issued must be forwarded to the special inspector of the state live stock sanitary board.''

In this instance the cattle were dipped under the directions of Dr. Thompkis, a federal officer. Mr. James, the local inspector, was present when the cattle were dipped; but the evidence shows that he took no part in the dipping, and under the afore mentioned rules Mr. James had no official connection with the dipping There is room for a difference of opinion as to what caused the death and injury of this bunch of cattle, but inasmuch as we have reached the conclusion that Mr. James had, and could have had, no official connection with the dipping, it is unnecessary to go into this question.

The appellant only insured the performance of the official acts of Mr. James, and what he may have done unofficially does not concern the appellant. Mr. James, in his official capacity, could not superintend or take any part in the dipping of the cattle. This being true the appellant here is not legally liable for the injury to appellee's property.

The judgment of the trial court will be reversed, and the suit dismissed.

*Reversed and dismissed.*